## UNITED STATES DISTRICT COURT
## DISTRICT COURT OF MINNESOTA

| | |
|---|---|
| CHARLES R. BLACKBURN, Derivatively on Behalf of Nominal Defendant 3M COMPANY, <br><br> Plaintiff, <br><br> v. <br><br> MICHAEL F. ROMAN, INGE G. THULIN, NICHOLAS C. GANGESTAD, THOMAS K. BROWN, DAVID B. DILLON, MICHAEL L. ESKEW, HERBERT L. HENKEL, AMY E. HOOD, MUHTAR KENT, DAMBISA F. MOYO, GREGORY R. PAGE, PATRICIA A. WOERTZ, EDWARD M. LIDDY, SONDRA L. BARBOUR, VANCE D. COFFMAN, and ROBERT J. ULRICH, <br><br> Defendants, <br><br> and <br><br> 3M COMPANY, <br><br> Nominal Defendant. | Case No. <br><br><br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Charles R. Blackburn ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, 3M Company ("3M" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, insider trading (*Brophy* claim), and contribution for Violations of Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's allegations are

1

based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by 3M with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.   NATURE AND SUMMARY OF THE ACTION

1.    3M is a diversified technology company that manufactures and sells a variety of chemical substances and related products, including industrial adhesives and tapes, abrasives, closure and masking systems, and sealants.  In the 1940s, 3M developed a class of synthetic chemical compounds called per- and polyfluoroalkyl substances ("PFAS") that can be used to manufacture a wide range of consumer and industrial products.  Due to their chemical structure, PFAS can cause extensive and persistent environmental contamination and are incredibly toxic to humans.

2.    For decades, the Company knew that PFAS were harmful to the environment and humans based on its internal studies that were not disclosed until 1998.  Shortly thereafter, 3M exited certain markets and phased out the sale of certain PFAS.

3.    However, the damage was done.  The Company, as well as 3M's customers who bought PFAS as raw material, faced lawsuits from municipalities related to the widespread contamination of PFAS and from individuals regarding personal and property injuries arising from the same.

4.    On February 13, 2017, one of 3M's major customers settled thousands of personal injury lawsuits for $671 million for health impacts traceable to PFAS.  Still, the

Company maintained in its public disclosures that it had reserved less than $100 million for environmental remediation costs and other environmental liabilities.

5.      Then, on February 20, 2018, 3M announced that it agreed to settle claims brought by the Minnesota Attorney General for ***$850 million***, making it the third largest settlement for a claim for damage to natural resources, behind the Deepwater Horizon and Exxon Valdez oil spill settlements.  The Company also agreed to provide up to $40 million over the first five years of the agreement for certain "temporary" water treatment solutions until long-term actions could be identified.

6.      Though analysts predicted that this settlement would be the first of many, the Company's officers assured the investing public that this was a "unique situation" because Minnesota "is our home state and [this is] something that we've been working on with them for a number of years."

7.      More than a year later, on April 25, 2019, 3M "established a reserve of $235 million to resolve certain environmental matters and litigation, in which 3M is a defendant, related to its historical manufacture and disposal of PFAS-containing waste."  However, the reserve did "not cover[] any of the product-related PFAS litigation."

8.      On this news, the Company's share price fell $28.36, or 13%, to close at $190.72 per share on April 25, 2019.

9.      While analysts noted that this reserve paled in comparison to the $5 billion liability the Company faced, 3M's officers represented that the PFAS-related liability was "ring-fenced" by the $235 million reserve.

10.     On July 8, 2019, the Company launched an investigation into the presence of PFAS in three closed municipal landfills that accepted waste from 3M's Decatur, Alabama plant and other manufacturing companies through the 1980s.

11.     On this news, the Company's share price fell $2.81, or 1.6%, to close at $169.19 per share on July 8, 2019.

12.     On February 6, 2020, the Company disclosed that it recorded an additional $214 million reserve for environmental liabilities.

13.     These revelations precipitated the filing of a securities class action in this District against 3M and certain of the defendants named herein, captioned *In re 3M Company Securities Litigation*, Case No. 20-cv-02488 (the "Securities Class Action").

14.     At least half of the Company's current Board could not disinterestedly and independently respond to a litigation demand in connection with the misleading representations because, among other things, at least eight of the eleven current directors knew that 3M faced significant environmental liabilities but did not cause the Company to conduct an assessment to record an appropriate reserve for potential exposure for liability. As a result, a majority of the Board could not disinterestedly investigate whether their conduct constituted breaches of fiduciary duties under Delaware law.

## II.     JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: contribution for violations of Section 10(b) of the Exchange Act.  This Court has supplemental jurisdiction over the state law claims

asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

16.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## III.    PARTIES

**Plaintiff**

17.     Plaintiff Charles R. Blackburn owns 1,032 shares of 3M stock and has continuously owned 3M stock since August 2011.

**Nominal Defendant**

18.     Nominal Defendant 3M is a Delaware corporation with its principal executive offices located at 3M Center, St. Paul, Minnesota 55144.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "MMM."

**Defendants**

19.     Defendant Michael F. Roman ("Roman") has served as Chief Executive Officer ("CEO") since July 2018 and Chairman of the Board of the Company since May 2019.

20.     Defendant Inge G. Thulin ("Thulin") served as CEO and Chairman of the company from 2012 to June 2018.

21.     Defendant Nicholas C. Gangestad ("Gangestad") served as Chief Financial Officer ("CFO") of the Company since 2014.

22.     Defendant Thomas K. Brown ("Brown") has served as a director of the Company since 2013.  He was a member of the Audit Committee at all relevant times.

23.     Defendant David B. Dillon ("Dillon") has served as a director of the Company since 2015.  He was Chair of the Audit Committee at all relevant times.

24.     Defendant Michael L. Eskew ("Eskew") has served as a director of the Company since 2003.

25.     Defendant Herbert L. Henkel ("Henkel") has served as a director of the Company since 2007.

26.     Defendant Amy E. Hood ("Hood") has served as a director of the Company since 2017.

27.     Defendant Muhtar Kent ("Kent") has served as a director of the Company since 2013.

28.     Defendant Dambisa F. Moyo ("Moyo") has served as a director of the Company since May 2018.  She is a member of the Audit Committee.

29.     Defendant Gregory R. Page ("Page") has served as a director of the Company since 2016.  He was a member of the Audit Committee at all relevant times.

30.     Defendant Patricia A. Woertz ("Woertz") has served as a director of the Company since 2016.

31.     Defendant Edward M. Liddy ("Liddy") served as a director of the Company from 2000 to May 2020.

6

32.    Defendant Sondra L. Barbour ("Barbour") served as a director of the Company from 2014 to May 2019.  She was a member of the Audit Committee.

33.    Defendant Vance D. Coffman ("Coffman") served as a director of the Company from 2002 to May 2018.

34.    Defendant Robert J. Ulrich ("Ulrich") served as a director of the Company from 2008 to 2017.

35.    Defendants Roman, Thulin, Gangestad, Brown, Dillon, Eskew, Henkel, Hood, Kent, Moyo, Page, Woertz, Liddy, Barbour, Coffman, and Ulrich are sometimes referred to hereinafter as the "Individual Defendants."

**Relevant Non-Party**

36.    Pamela J. Craig ("Craig") has served as a director of the Company since May 2019.  She has served as a member of the Audit Committee since May 2019.

## IV.    DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

37.    By reason of their positions as officers, directors, and/or fiduciaries of 3M and because of their ability to control the business and corporate affairs of 3M, at all relevant times, the Individual Defendants owed 3M and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage 3M in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of 3M and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to 3M and its

shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of 3M, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with 3M, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

39.     To discharge their duties, the officers and directors of 3M were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of 3M were required to, among other things:

 (a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

 (b) Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

 (c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

 (d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

**B.**     **Audit Committee Charter**

40.     The charter of the Audit Committee provides that its members are responsible for, among other things, "the integrity of the Company's financial statements and internal controls over financial reporting" and "the Company's capital structure and financial risk assessment and management."

41.     With respect to financial reporting and disclosure, the charter provides that the Audit Committee must:

> a. Review and discuss the annual audited financial statements and quarterly financial statements with management and the Independent Accounting Firm, including the disclosures under the caption "Management Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall make a recommendation to the Board as to whether the audited financial statements should be included in the Company's Annual Report on Form 10-K.

> b. Review the Company's financial reporting processes, including internal controls over financial reporting, and the process for the CEO and CFO quarterly certifications required by the SEC with respect to the Company's financial statements and internal controls over financial reporting. Such review shall include a consideration of major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and any reports by the CEO and CFO regarding major issues as to the adequacy of the Company's internal controls over financial reporting, and any special audit steps performed in response to identified deficiencies.

> c. Review and discuss with management (including the senior internal audit executive) and the Independent Accounting Firm the Company's report on internal controls over financial reporting and the Independent Accounting Firm's audit of internal controls over financial reporting prior to filing of the Company's Form 10-K.

> d. Obtain and periodically review a report from the Independent Accounting Firm, describing (i) all critical accounting policies and practices to be used in the financial statements; (ii) all alternative treatments of financial information within generally accepted accounting principles that have been discussed with management, ramifications of the use of such alternative

disclosures and treatments, and the treatment preferred by the Independent Accounting Firm; (iii) any significant change in the selection or application of accounting principles; and (iv) other material written communications between the Independent Accounting Firm and management, such as any management representation letter, letters from the Company's General Counsel (or his designee), and/or schedule of uncorrected and corrected misstatements. Review any reports on such topics or similar topics prepared by management, including any significant financial reporting issues and judgments made in connection with the preparation of the financial statements. Discuss with the Independent Accounting Firm any material issues raised in such reports.

e. Participate in a telephonic meeting among management and the Independent Accounting Firm before each earnings release to review the earnings release, financial information, use of any non-GAAP information, and earnings guidance.

f. Discuss with management and the Independent Accounting Firm (i) the effect of regulatory and accounting pronouncements, as well as off-balance sheet structures, if any, on the Company's financial statements, (ii) significant, unusual, or complex transactions, and (iii) the risk of fraud and the implementation of fraud controls.

42.      Regarding risk management and compliance, the Audit Committee charter provides that members must, among other things:

a. Discuss policies and procedures with respect to risk assessment and risk management, the Company's major risk exposures and the steps management has taken to monitor and mitigate such exposures.

*      *      *

e. Review the effectiveness of the system for monitoring compliance with laws, regulations and the Company's business conduct policies and the results of management's investigation and follow-up on any fraudulent acts or accounting irregularities. Providing oversight of the Company's environmental stewardship, including environmental, health and Safety (EHS) legal and regulatory compliance, is the responsibility of the Science, Technology & Sustainability Committee.

*      *      *

h. Review with the Company's General Counsel legal matters that may have a material impact on the consolidated financial statements and any material reports or inquiries received from regulators or governmental agencies regarding compliance.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Background

43.     3M is a diversified technology company that manufactures and sells a variety of chemical substances and related products, including industrial adhesives and tapes, abrasives, closure and masking systems, sealants.

44.     In the 1940s, 3M developed a class of synthetic chemical compounds called PFAS that can be used to manufacture a wide range of consumer and industrial products, including non-stick coatings in the food industry, water and stain protection in the textile industry, and high temperature fire-fighting foam.  PFAS are a type of perfluorochemical ("PFS"), whereby the bonding of fluorine and carbon atoms creates one of the strongest molecular bonds, which provides for extreme chemical durability.   Two well-known examples of PFAS are perfluorooctane sulfanate ("PFOS") and perfluorooctanoic acid ("PFOA"); each molecule contains a "backbone" of eight carbon atoms with fluorine atoms attached thereto.

45.     The structure of PFAS makes the chemicals useful for a variety of consumer, commercial, and industrial applications that require properties such as heat and fire resistance, stain resistance, friction resistance, oil, chemical, and water repellence, and electrical insulation.

11

46.     These same properties also enable PFAS to cause extensive and persistent environmental contamination.  For example, PFAS are highly water soluble and do not stick to soil particles, so they are readily transported into groundwater where they can form chemical plumes that migrate long distances.  Additionally, PFAS are durable and persistent, so they do not readily degrade over time in the environment.  Because PFAS are not easily removed by conventional municipal water treatment systems, those systems must be retrofitted with specialized and expensive remediation equipment to effectively remove PFAS from contaminated waters.  Therefore, PFAS can remain in the environment for many years and have been termed "forever chemicals."

47.     3M uses PFAS in its own finished goods and also sells it as a raw material to other customers, especially manufacturers who use them as chemical feedstock or processing aid in their own industrial operations.  For decades, the Company sold PFOA in large quantities to E.I. du Pont de Nemours & Company ("DuPont"), which used it to manufacture Teflon products.  Beginning in the 1960s, 3M also began producing a PFAS-based firefighting foam called Aqueous Film Forming Foam ("AFF Foam"), which is used by the military to extinguish fires at airbases, fire and crash training sites, and other installations around the country.

48.     At all relevant times, 3M's public filings disclose that the Company operates in a highly regulated industry.  For example, the Company's Form 10-K filed February 6, 2020, states, "3M's manufacturing operations are affected by national, state and local environmental laws around the world. 3M has made, and plans to continue making, necessary expenditures for compliance with applicable laws."

**B.    3M Ceased PFAS Production and Faces Litigation For the Harmful Impact of PFAS**

49.    In 1998, 3M released a trove of scientific data to the EPA, and in 2000, the Company announced that it would phase out production of PFOS and POA in the face of regulatory pressure and mounting evidence that the substances were harmful.  3M vacated certain markets and product areas altogether due to the phase out and for other products, the Company developed an alternative using pertluorobutane sulfonate ("PFBS").

50.    In 2009, the EPA established provisional levels of 400 parts per trillion ("ppt") for PFOA and 200 ppt for PFOS to assess the potential risk from exposure to these chemicals through drinking water.  This pales in comparison to the detected levels of contamination; for example, AFF Foam-related contamination at a site near Atlantic City, New Jersey tested as high as 95,000 ppt for PFOS and 41,000 ppt for PFOA.

51.    In May 2016, these provisional levels were reevaluated, and the EPA reduced the safe lifetime drinking water limit to 70 ppt, which significantly increased the number of water systems potentially contaminated by 3M's manufacturing activities.  According to an article by *The New York Times* published July 25, 2016, "Defense Department officials initially identified about 700 sites of possible contamination [in connection with AFF Foam], but that number has surged to at least 2,000, most of them on Air Force bases." The article quoted Jennifer Feld, an expert on the chemistry of AFF Foam, saying that "[i]t's quite possible it [i.e. contaminated water from AFF Foam] will touch every state."

52.    Meanwhile, the Company faced lawsuits from various municipalities related to the widespread contamination of PFAS it had caused.  Notably, in 2010, Minnesota's

13

Attorney General sued 3M for damages for the destruction and loss of use of the state's natural resources under the Minnesota Environmental Response and Liability Act and the Minnesota Water Pollution Control Act, as well as certain claims arising from the Company's PFAS manufacturing site in the state ("Minnesota A.G. Litigation").

53.     The Company's customers likewise faced liability for their use of the Company's PFAS.  On February 13, 2017, DuPont and related companies settled thousands of personal injury lawsuits for $671 million for PFOA health impacts.  As media recognized, this was a signal of how other suits could proceed.  For example, *The Wall Street Journal* published an article entitled "DuPont Settlement of Chemical Exposure Case Seen as 'Shot in the Arm' for Other Suits," noting that the settlement was reached midway through the trial of a pipe fitter who had been diagnosed with testicular cancer from PFOA-contaminated water.

54.     Other suits and regulatory actions include:

(a)     In 2002, current and former 3M employees sued for personal injuries related to their exposure to toxic chemicals at the Company's plant in Decatur, Alabama; though the complaint was dismissed in 2005, an amended complaint alleging property damage in the vicinity of the plant remains under litigation.  Two related suits were filed by nearby residents alleging that the PFAS chemicals from the plant contaminated soil and groundwater, thereby lowering property values.

(b)     On May 22, 2007, the Minnesota Pollution Control Agency ("MPCA") Citizens' Board approved a settlement agreement and consent order between 3M and MPCA regarding the releases and discharges of PFCs at and from sites in

Washington County, Minnesota and certain related matters.  The consent order required 3M to meet certain deadlines for required submissions, and the Citizens' Board requested quarterly updates on the progress of the action items in response to the PFC contamination issues.

(c)     In 2008, 3M entered into a voluntary remedial action agreement with the Alabama Department of Environmental Management to address the presence of PFCs in the soil at the Company's manufacturing facility in Decatur.  The Company incorporated its wastewater treatment plant sludge containing PFCs in fields at its Decatur facility for approximately twenty years.

(d)     In October 2015, West Morgan-East Lawrence Water and Sewer Authority ("WMELA") filed individual and class action claims against the Company and others alleging that chemicals, including PFAS, from 3M's manufacturing processes in Decatur have contaminated the water in the Tennessee River.  The complaint alleges that the chemicals cannot be removed by the water treatment processes used by WMELA.  In September 2016, the court denied-in-part 3M's motion to dismiss and allowed the claims of negligence for property damage, public nuisance, abatement of nuisance, battery, and wantonness to proceed.

(e)     In June 2016, Tennessee Riverkeeper, Inc. sued 3M and others alleging violations of the Resource Conservation and Recovery Act regarding the disposal of PFCs through the Company's ownership and operation of its sites.  On February 10, 2017, the court denied 3M's motion to dismiss the case.

15

(f)    In January 2017, plaintiffs who receive water from WMELA sued 3M, its subsidiary Dyneon, and others, alleging that the defendants' manufacturing and disposal facilities in Decatur have released and continue to release PFOA, PFOS, and related chemicals into the groundwater and surface water of their sites, resulting in discharge into the Tennessee River.

(g)    In May 2017, the Water Works and Sewer Board of the Town of Centre, Alabama sued 3M, DuPont, and various carpet and textile manufacturers, alleging that defendants' facilities contaminated the town's source for drinking water. The complaint seeks unspecified damages for the installation and operation of a filtration system, expenses to monitor PFC levels, lost profits and sales, and injunctive relief.

(h)    Approximately 120 class action and other lawsuits have been filed against 3M and others regarding damages caused by PFAS in AFF Foam used at current and former airports, refineries, military bases, and fire training facilities. They were consolidated in late 2018 into a multi-district litigation case pending in the U.S. District Court for the District of Southern Carolina.

(i)    In 2019, several states filed actions against 3M and others related to the PFAS contamination, some of which have been consolidated with the AFF Foam MDL case.

### C.    The Individual Defendants Cause the Company to Issue Misleading Statements

55.    On February 9, 2017, defendants Thulin, Gangestad, Barbour, Brown, Coffman, Dillon, Eskew, Henkel, Kent, Liddy, Page, Ulrich, and Woertz signed and caused

3M to file its annual report on Form 10-K for the period ended December 31, 2016 (the

"2016 10-K") with the SEC.   Regarding environmental liabilities, the 2016 10-K stated,

in relevant part:

*Environmental Liabilities and Insurance Receivables*

**As of December 31, 2016, the Company had recorded liabilities of $38 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $11 million.** The Company records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

**As of December 31, 2016, the Company had recorded liabilities of $29 million for "other environmental liabilities" based upon an evaluation of currently available facts** to implement the Settlement Agreement and Consent Order with the MPCA, the remedial action agreement with ADEM, and to address trace amounts of perfluorinated compounds in drinking water sources in the City of Oakdale, Minnesota, as well as presence in the soil and groundwater at the Company's manufacturing facilities in Decatur, Alabama, and Cottage Grove, Minnesota, and at two former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). The Company expects that most of the spending will occur over the next four years. As of December 31, 2016, the Company's receivable for insurance recoveries related to "other environmental liabilities" was $15 million.

It is difficult to estimate the cost of environmental compliance and remediation given the uncertainties regarding the interpretation and enforcement of applicable environmental laws and regulations, the extent of environmental contamination and the existence of alternative cleanup methods. Developments may occur that could affect the Company's current

assessment, including, but not limited to: (i) changes in the information available regarding the environmental impact of the Company's operations and products; (ii) changes in environmental regulations, changes in permissible levels of specific compounds in drinking water sources, or changes in enforcement theories and policies, including efforts to recover natural resource damages; (iii) new and evolving analytical and remediation techniques; (iv) success in allocating liability to other potentially responsible parties; and (v) the financial viability of other potentially responsible parties and third-party indemnitors. ***For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition.*** However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

56.     Regarding environmental law compliance, the 2016 10-K stated that "[r]eserves for liabilities are anticipated remediation costs are recorded on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies, the Company's commitment to a plan of action, or approval by regulatory agencies."

57.     As to the potential liability exposure for litigation, 3M stated: "Although the Company cannot estimate its exposure to all legal proceedings, it currently believes that such future charges, if any, would not have a material adverse effect on the consolidated financial position of the Company."

58.     The above statements in ¶¶ 56-57 were materially misleading because they failed to disclose the full extent of liabilities the Company faced related to its manufacture, distribution, and disposal of PFAS.

59.     On May 3, 2017, defendants Thulin, Gangestad, Barbour, Brown, Coffman, Dillon, Eskew, Henkel, Kent, Liddy, Page, Ulrich, and Woertz caused 3M to file its quarterly report on Form 10-Q for the period ended March 31, 2017, which described the Company's environmental liabilities as follows:

*Environmental Liabilities and Insurance Receivables*

**As of March 31, 2017, the Company had recorded liabilities of $36 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million.** The Company records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

**As of March 31, 2017, the Company had recorded liabilities of $29 million for "other environmental liabilities"** . . .

60.     The above statements in ¶ 59 were materially misleading because they failed to disclose the full extent of liabilities the Company faced related to its manufacture, distribution, and disposal of PFAS.

61.     On August 1, 2017, defendants Thulin, Gangestad, Barbour, Brown, Coffman, Dillon, Eskew, Henkel, Hood, Kent, Liddy, Page, and Woertz caused 3M to file its quarterly report on Form 10-Q for the period ended June 30, 2017, which described the Company's environmental liabilities as follows:

*Environmental Liabilities and Insurance Receivables*

**As of June 30, 2017, the Company had recorded liabilities of $36 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million**. The Company records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

**As of June 30, 2017, the Company had recorded liabilities of $28 million for "other environmental liabilities"** . . . For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

62.    The above statements in ¶ 61 were materially misleading because they failed to disclose the full extent of liabilities the Company faced related to its manufacture, distribution, and disposal of PFAS.

63.    On October 31, 2017, defendants Thulin, Gangestad, Barbour, Brown, Coffman, Dillon, Eskew, Henkel, Hood, Kent, Liddy, Page, and Woertz caused 3M to file

its quarterly report on Form 10-Q for the period ended September 30, 2017, in which the

Company described its environmental liabilities as follows:

*Environmental Liabilities and Insurance Receivables*

**As of September 30, 2017, the Company had recorded liabilities of $38 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million.** The Company records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

**As of September 30, 2017, the Company had recorded liabilities of $27 million for "other environmental liabilities" . . .** For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

64.     The above statements in ¶ 63 were materially misleading because they failed

to disclose the full extent of liabilities the Company faced related to its manufacture,

distribution, and disposal of PFAS.

21

65.     On November 17, 2017, the Minnesota Attorney General filed a motion to amend its complaint in the Minnesota A.G. Litigation to seek punitive damages against the Company.  In support of its motion, the Minnesota Attorney General asserted that clear and convincing evidence existed showing that 3M had acted with deliberate disregard for the rights or safety of others.  In addition to describing the Company's multi-decade campaign to conceal the known harms of PFAS from the public, governments, and its customers, the motion detailed how the Company, beginning in the late 1990s, had conducted a coordinated program designed to distort the scientific community's understanding of the harms caused by PFAS by suppressing harmful research and paying tens of millions of dollars to ensure that more favorable research was produced and widely disseminated.

66.     On February 8, 2018, defendants Thulin, Gangestad, Barbour, Brown, Coffman, Dillon, Eskew, Henkel, Hood, Kent, Liddy, Page, and Woertz signed and caused 3M to file its annual report on Form 10-K for the period ended December 31, 2017 (the "2017 10-K"). Regarding environmental liabilities, the 2017 10-K stated:

*Environmental Liabilities and Insurance Receivables*

**As of December 31, 2017, the Company had recorded liabilities of $28 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million.** The Company records liabilities for remediation costs on an undiscounted basis when they are probable and reasonably estimable, generally no later than the completion of feasibility studies or the Company's commitment to a plan of action. Liabilities for estimated costs of environmental remediation, depending on the site, are based primarily upon internal or third-party environmental studies, and estimates as to the number, participation level and financial viability of any other potentially responsible parties, the extent of

22

the contamination and the nature of required remedial actions. The Company adjusts recorded liabilities as further information develops or circumstances change. The Company expects that it will pay the amounts recorded over the periods of remediation for the applicable sites, currently ranging up to 20 years.

*As of December 31, 2017, the Company had recorded liabilities of $25 million for "other environmental liabilities"* based upon an evaluation of currently available facts to implement the Settlement Agreement and Consent Order with the MPCA, the remedial action agreement with ADEM, and to address trace amounts of perfluorinated compounds in drinking water sources in the City of Oakdale, Minnesota, as well as presence in the soil and groundwater at the Company's manufacturing facilities in Decatur, Alabama, and Cottage Grove, Minnesota, and at two former disposal sites in Washington County, Minnesota (Oakdale and Woodbury). The Company expects that most of the spending will occur over the next four years. During the first quarter of 2017, the Company collected from its insurer the outstanding receivable of $15 million related to "other environmental liabilities."

\*      \*      \*

For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

67.     Moreover, regarding environmental law compliance, the 2017 10-K stated:

"While the Company cannot predict with certainty the future costs of such cleanup activities, capital expenditures or operating costs for environmental compliance, *the Company does not believe they will have a material effect on its capital expenditures, earnings or competitive position.*"

68.     The 2017 10-K further stated: "Although the Company cannot estimate its exposure to all legal proceedings, it currently believes, except as described below, that such future charges, if any, would not have a material adverse effect on the consolidated financial position of the Company."

69.     The above statements in ¶¶ 66-68 were materially misleading because they failed to disclose the full extent of liabilities the Company faced related to its manufacture, distribution, and disposal of PFAS.

**D.     The Truth Begins to Emerge**

70.     On February 20, 2018, the Company announced that it agreed to settle the Minnesota A.G. Litigation for $850 million in the form of a grant used for clean drinking water and natural resource projects.  This marked the third-largest settlement for a claim for damage to natural resources, behind the Deepwater Horizon and Exxon Valdez oil spill settlements.  3M also agreed to provide up to $40 million over the first five years of the agreement for certain "temporary" water treatment solutions until long-term actions could be identified.

71.     Analysts pointed out the disparity between the settlement amount and the Company's reserve for environmental liabilities.  RBC Capital Markets wrote: "the $850 million settlement far exceeds the ~$50 million of recorded environmental liabilities on the company's balance sheet. . . ."  J.P. Morgan predicted that the settlement would be the first of many, noting that the "[k]ey here is that, according to Press reports, there are several other suits outstanding in several other states that are likely to cue off of this case to varying degrees."  As to the other PFAS-related litigation, the J.P. Morgan report noted that 3M

"[m]anagement maintains there is little risk in other suits but they still bear watching, as the sheer magnitude is something of an outlier."

72.    When it announced the settlement, which came a few days before a trial was scheduled in the lawsuit, the Minnesota Attorney General was quoted in media reports as stating, "The deal has been in the works for weeks, she said, with negotiations lasting through early Tuesday morning."

73.    After the settlement was announced, the Minnesota Attorney General made public the internal emails and memoranda 3M had produced during the litigation.  The documents showed that the Company had been aware as early as 1970s that PFAS posed a serious risk to public health, and that 3M had withheld that information from state and federal regulators for decades.

74.    On April 24, 2018, the Company held its conference call in connection with its first quarter 2018 financial results.  During the call, analysts sought to clarify whether the settlement is a precedent for litigation and potential exposure in other states.  However, defendant Roman assured:

> *No, this is a unique situation. This is our home state and something that we've been working on with them for a number of years. So this is a unique situation in both the nature of the case as well as the grant and the process that we're working through with them.*

75.    On April 27, 2018, the SEC asked 3M to explain why it had not taken a charge for the Minnesota action in the Form 10-K filed just two weeks before the settlement was announced.  Specifically, the SEC stated:

> You disclose [on February 8, 2018] that as of December 31, 2017 you had not recorded any liability related to the Minnesota Environmental Litigation

25

because you believed any such liability was not probable and estimable. However, we note from your Form 8-K dated February 20, 2018 that you settled the lawsuit on that day for $850 million. Please address the following:

- Please provide us with your analysis of ASC 450-20-25 and ASC 450-20-30 in determining that no loss contingency accrual relating to this action was required as of December 31, 2017. Clearly explain to us why the loss contingency was not probable and estimable as of that date.

- Tell us how you considered the guidance in ASC 855 – Subsequent Events – in concluding on your disclosures relating to this matter in this Form 10-K, which was filed with us on February 8, 2018.

76.     On May 8, 2018, 3M responded to the SEC that "because any liability arising from this litigation was neither probable nor estimable, or if estimable had a low end of the range of $0, the Company concluded that no accrual for this matter was required in its financial statements for the period ended December 31, 2017." The Company also stated that between the close of the period for the 2017 10-K and the date it was filed, "no event or development occurred in the litigation that changed the Company's view of the case as of the balance sheet date or as of the date the Company filed its Form 10-K."

77.     Also on May 8, 2018, defendants Thulin, Gangestad, Barbour, Brown, Coffman, Dillon, Eskew, Henkel, Hood, Kent, Liddy, Page, and Woertz caused 3M to file its quarterly report on Form 10-Q for the period ended March 31, 2018.  Regarding environmental liabilities, the Company stated:

*Environmental Liabilities and Insurance Receivables*

As of March 31, 2018, the Company had recorded liabilities of $31 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million. . . . As of March 31, 2018, the Company had recorded liabilities of $54 million for "other environmental liabilities" . . . .

26

For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

78.    The above statements in ¶¶ 74, 77 were materially misleading because they failed to disclose the full extent of liabilities the Company faced related to its manufacture, distribution, and disposal of PFAS.

79.    On July 26, 2018, defendants Roman, Gangestad, Barbour, Brown, Dillon, Eskew, Henkel, Hood, Kent, Liddy, Moyo, Page, and Woertz caused 3M to file its quarterly report on Form 10-Q for the period ended June 30, 2018.   Regarding environmental liabilities, the report stated:

*Environmental Liabilities and Insurance Receivables*

**As of June 30, 2018, the Company had recorded liabilities of $30 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million.** . . . As of June 30, 2018, the Company had recorded liabilities of $59 million for "other environmental liabilities" . . . .\

For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

80.     The above statements in ¶ 79 were materially misleading because they failed to disclose the full extent of liabilities the Company faced related to its manufacture, distribution, and disposal of PFAS.

81.     On October 25, 2018, Roman, Gangestad, Barbour, Brown, Dillon, Eskew, Henkel, Hood, Kent, Liddy, Moyo, Page, and Woertz caused 3M to file its quarterly report on Form 10-Q for the period ended September 30, 2018, which stated regarding environmental liabilities:

*Environmental Liabilities and Insurance Receivables*

As of September 30, 2018, the Company had recorded liabilities of $29 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million. . . . As of September 30, 2018, the Company had recorded liabilities of $69 million for "other environmental liabilities" . . . .

For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

82.     The above statements in ¶ 81 were materially misleading because they failed to disclose the full extent of liabilities the Company faced related to its manufacture, distribution, and disposal of PFAS.

83.     On February 7, 2019, defendants Roman, Gangestad, Barbour, Brown, Dillon, Eskew, Henkel, Hood, Kent, Liddy, Moyo, Page, and Woertz caused 3M to file its

annual report on Form 10-K for the period ended December 31, 2018 (the "2018 10-K").

Regarding the Company's environmental liabilities, the 2018 10-K stated, in relevant part:

*Environmental Liabilities and Insurance Receivables*

***As of December 31, 2018, the Company had recorded liabilities of $25 million for estimated "environmental remediation" costs based upon an evaluation of currently available facts with respect to each individual site and also recorded related insurance receivables of $8 million.*** . . . As of December 31, 2018, the Company had recorded liabilities of $59 million for "other environmental liabilities" . . . .

For sites included in both "environmental remediation liabilities" and "other environmental liabilities," at which remediation activity is largely complete and remaining activity relates primarily to operation and maintenance of the remedy, including required post-remediation monitoring, the Company believes the exposure to loss in excess of the amount accrued would not be material to the Company's consolidated results of operations or financial condition. However, for locations at which remediation activity is largely ongoing, the Company cannot estimate a possible loss or range of loss in excess of the associated established accruals for the reasons described above.

84.     Regarding environmental law compliance, the 2018 10-K stated: "While the Company cannot predict with certainty the future costs of such cleanup activities, capital expenditures or operating costs for environmental compliance, the Company does not believe they will have a material effect on its capital expenditures, earnings or competitive position."

85.     Regarding potential exposure for all litigation, the 2018 10-K stated: "Although the Company cannot estimate its exposure to all legal proceedings, the Company currently believes that the ultimate outcome of legal proceedings or future charges, if any, would not have a material adverse effect on the consolidated financial position of the Company."

86.     The above statements in ¶¶ 83-85 were materially misleading because they failed to disclose the full extent of liabilities the Company faced related to its manufacture, distribution, and disposal of PFAS.

### E.     The Truth Continues to Emerge

87.     On April 25, 2019, the Company announced its first quarter 2019 financial results in a press release reporting that 3M had "established a reserve of $235 million to resolve certain environmental matters and litigation, in which 3M is a defendant, related to its historical manufacture and disposal of PFAS-containing waste." The reserve related to five manufacturing plants where the Company manufactured PFAS in Alabama, Illinois, Minnesota, Belgium, and Germany.

88.     The same day, 3M held a conference call in connection with the results. During the call, defendant Roman stated that "what we were able to do with the reserve this quarter is to really establish reserves that help us resolve the litigation that is related to environmental matters and, I would say, litigation where we're the direct defendant around our manufacturing and disposal." However, he clarified that this reserve did "not cover[] any of the product-related PFAS litigation," and focused exclusively on the liabilities arising from the five locations where 3M had manufactured PFAS.

89.     As a result, analysts were concerned that that "PFAS litigation remains an unquantifiable concern," and Deutsche Bank "fear[ed] that the $235m reserve increase taken in 1Q will continue to grow over time," especially because the reserve "looks low vs. $800m+ paid to Minnesota already." Similarly, J.P. Morgan stated that the litigation charges "probably [are] not big enough as a 'ring fence' event, *we expect a parade of*

30

*settlements and charges into future years, and question why, if these do turn out to be several billion dollars, we are excluding them from EPS as they likely run through FCF.*"  RBC Capital Markets stated that "[w]e foresee risk that the company's full legal liability could still exceed the amount that it has reserved for, resulting in additional charges in future quarters."

90.    On this news, the Company's share price fell $28.36, or 13%, to close at $190.72 per share on April 25, 2019.

91.    On April 26, 2019, 3M filed a quarterly report on Form 10-Q for the period ended March 31, 2019 with the SEC (the "1Q19 10-Q").  Therein, the Company stated:

*Environmental Liabilities and Insurance Receivables*

The Company periodically examines whether the contingent liabilities related to the environmental matters and litigation described above are probable and estimable based on experience and developments in those matters. During the first quarter of 2019, the EPA issued its PFAS Action Plan and the Company settled the litigation with the Water Authority (both matters are described in more detail above). The Company recently completed a comprehensive review with the assistance of environmental consultants and other experts regarding environmental matters and litigation related to historical PFAS manufacturing operations in Minnesota, Alabama, Gendorf Germany, and at four former landfills in Alabama. As a result of these developments and of that review, the ***Company increased its accrual for "other environmental liabilities" by $235 million pre-tax*** (including the settlement with the Water Authority) or $186 million after tax ($0.32 per diluted share). As of March 31, 2019, the Company had recorded liabilities of $292 million for "other environmental liabilities." This accrual represents the Company's best estimate of the probable loss: (i) to implement the Settlement Agreement and Consent Order with the MPCA (including the best estimate of the probable liability under the settlement of the NRD Lawsuit with the State of Minnesota for interim treatment of municipal and private wells), (ii) the remedial action agreement with ADEM, (iii) mitigation plans for the presence of PFAS in the soil and groundwater at two former disposal sites in Washington County, Minnesota (Oakdale and Woodbury), (iv) to cover certain environmental matters and litigation in which 3M is a defendant

related to the manufacture and disposal of PFAS at five 3M facilities, including three in the United States and two in Europe. The Company is not able to estimate a possible loss or range of loss in excess of the established accruals at this time.

92.     Also on April 26, 2019, 3M and the WMELA announced that it had settled litigation regarding the Company's production of PFAS at its Decatur plant, approximately 10 miles upstream from WMELA's water treatment plant.  The settlement provides for "a new filtration system at WMELA[, enabling WMELA] to continue to supply safe drinking water that meets all applicable PFAS guidelines without passing on any additional construction or treatment costs."  According to media reports, WMELA planned to build a reverse osmosis system, which could cost as much as $43 million.

93.     On May 15, 2019, defendant Gangestad asserted that 3M's PFAS-related liability was "ring-fenced" by the $235 million reserve that the Company had taken:

> On PFAS, the ring-fence I would call it [sic] is ring-fenced around liability around our 5 manufacturing sites and disposal of PFAS. Because that's a view where we looked at all the discussions going on in all of the sites, all the litigation and putting our best estimate together of what we think all of those costs will be. So that portion, I would call ring-fenced.

94.     On June 6, 2019, Barclays issued a report summarizing the PFAS-related lawsuits against 3M and estimated that the potential liabilities could total $5 billion:

> As the longest standing upstream PFAS manufacturer, the breadth of potential liabilities potentially facing MMM is quite large; in total we estimate a probability weighted total PFAS liability of $5bn. For the basis of this discussion we have split the liabilities into four buckets.
>
> (i) MMM manufacturing sites and the impact on state resources (Barclays estimate for the probability weighted potential liability - $0.6bn)
>
> (ii) MMM manufacturing sites and the impact on individuals (Barclays estimate for the probability weighted potential liability - $0.4bn)

(iii) Consolidated MMM product use cases – military bases (Barclays estimate for the probability weighted potential liability - $0.2bn)

(iv) Consolidated MMM product use cases – broader population (Barclays estimate for the probability weighted potential liability - $3.7bn)

95.     On July 8, 2019, 3M announced that it had launched an investigation into the presence of PFAS in three closed municipal landfills that accepted waste from the Company's Decatur plant and other manufacturing companies through the 1980s.  The Company stated that "for the past several months, 3M has been conducting a thorough search for former landfills in Morgan and Lawrence Counties to test for any waste that may include PFAS."  The investigation had been expanded to other sites, "[a]t the request of City of Decatur and Morgan County officials," including "an evaluation of the closed waste disposal sites of Brookhaven, Deer Springs and Old Moulton Road/Mud Tavern."

96.     On this news, the Company's share price fell $2.81, or 1.6%, to close at $169.19 pe share on July 8, 2019.

97.     On July 26, 2019, 3M revealed that it had found reporting inaccuracies in certain of its required pollutant discharge reports to Alabama DEM in connection with the PFAS dumped into the Tennessee River from the Decatur plant.  Specifically, the Company stated that it had "disclosed to the EPA and [Alabama] DEM that it had included incorrect values in certain of its monthly and quarterly reports."

98.     According to an October 27, 2019 report by Barclays, "3M has been named in 304 (up from 283) individual cases related to PFAS Environmental Litigation in Alaska, New York, Michigan, and Maine."  It also noted that "[a]s of September 30, MMM is

named in 12 cases (up from 10 at end June) brought by Attorneys General in New York, Ohio, New Jersey, New Hampshire, Vermont, and Guam related to PFAS."

99.    On November 26, 2019, media reported preliminary results from the investigation of the three closed municipal landfills in Decatur, including that the Brookhaven/Aquadome landfill, Old Moulton Road landfill, and Deer Springs landfill showed PFAS levels that were 50, 900, and 3000 times, respectively, greater than the EPA's guideline of 70 ppt.

100.    On January 14, 2020, then Attorney General of Michigan announced a lawsuit against 3M and others arising from the damage to the state caused by PFAS.

101.    On February 6, 2020, the Company disclosed that it recorded a $214 million reserve for environmental liabilities.  In its annual report for the period ended December 31, 2019, 3M revealed that it had "received a grand jury subpoena from the U.S. Attorney's Office for the Northern District of Alabama for documents related to, among other matters, the Company's compliance with the 2009 TSCA consent order and unpermitted discharges to the Tennessee River."  The Form 10-K further stated:

*Environmental Liabilities and Insurance Receivables*

The Company periodically examines whether the contingent liabilities related to the environmental matters and litigation described above are probable and estimable based on experience and developments in those matters. During the first quarter of 2019, the EPA issued its PFAS Action Plan and the Company settled the litigation with the Water Authority (both matters are described in more detail above). The Company completed a comprehensive review with the assistance of environmental consultants and other experts regarding environmental matters and litigation related to historical PFAS manufacturing operations in Minnesota, Alabama, Gendorf Germany, and at four former landfills in Alabama. As a result of these developments and of that review, the Company increased its accrual for

"other environmental liabilities" by $235 million pre-tax (including the settlement with the Water Authority) in the first quarter of 2019. During the fourth quarter of 2019, 3M updated its evaluation of certain customer-related litigation based on continued, productive settlement discussions with multiple parties. ***As previously disclosed, 3M has been engaged in mediation and resolution negotiations in multiple cases. In addition, during the fourth quarter, the Company updated its assessment of environmental matters and litigation related to its historical PFAS manufacturing operations and expanded its evaluation of other 3M sites that may have used certain PFAS-containing materials and locations at which they were disposed. As a result of these actions during the fourth quarter the Company recorded a pre-tax charge of $214 million. As of December 31, 2019, the Company had recorded liabilities of $445 million for "other environmental liabilities."*** The accruals represent the Company's best estimate of the probable loss. The Company is not able to estimate a possible loss or range of loss in excess of the established accruals at this time.

As of December 31, 2019, the Company had recorded liabilities of $19 million for estimated non-PFAS related "environmental remediation" costs to clean up, treat, or remove hazardous substances at current or former 3M manufacturing or third-party sites.

### F.     Defendants Thulin, Roman, and Gangestad Sold More than $40 Million in 3M Stock While in Possession of Material Non-Public Information

102.    Defendant Thulin was the Company's CEO with a highly sophisticated understanding of the Company's results and their import.

103.    As set forth herein, as early as February 2017, defendant Thulin possessed material negative information which he knew was being concealed from investors. Defendant Thulin consciously acted to exploit his knowledge by selling over $36 million of 3M stock to his substantial benefit, as follows:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 2/9/2017 | 400 | $177.63 | $71,052 |
| 2/9/2017 | 700 | $177.52 | $124,264 |
| 2/9/2017 | 620 | $177.35 | $109,957 |
| 2/9/2017 | 200 | $177.58 | $35,516 |
| 2/9/2017 | 738 | $177.30 | $130,847 |

| 2/9/2017 | 577 | $177.27 | $102,285 |
|---|---|---|---|
| 2/9/2017 | 500 | $177.24 | $88,620 |
| 2/9/2017 | 588 | $177.34 | $104,276 |
| 2/9/2017 | 1,381 | $177.31 | $244,865 |
| 2/9/2017 | 1,029 | $177.62 | $182,771 |
| 2/9/2017 | 6,400 | $177.50 | $1,136,000 |
| 2/9/2017 | 700 | $177.36 | $124,152 |
| 2/9/2017 | 100 | $177.54 | $17,754 |
| 2/9/2017 | 319 | $177.28 | $56,552 |
| 2/9/2017 | 408 | $177.48 | $72,412 |
| 2/9/2017 | 1,027 | $177.43 | $182,221 |
| 2/9/2017 | 601 | $177.33 | $106,575 |
| 2/9/2017 | 5,100 | $177.49 | $905,199 |
| 2/9/2017 | 3,494 | $177.37 | $619,731 |
| 2/9/2017 | 600 | $177.26 | $106,356 |
| 2/9/2017 | 1,192 | $177.45 | $211,520 |
| 2/9/2017 | 600 | $177.11 | $106,266 |
| 2/9/2017 | 200 | $177.64 | $35,528 |
| 2/9/2017 | 290 | $177.57 | $51,495 |
| 2/9/2017 | 394 | $177.39 | $69,892 |
| 2/9/2017 | 5,506 | $177.46 | $977,095 |
| 2/9/2017 | 100 | $177.09 | $17,709 |
| 2/9/2017 | 405 | $177.38 | $71,839 |
| 2/9/2017 | 500 | $177.23 | $88,615 |
| 2/9/2017 | 300 | $177.18 | $53,154 |
| 2/9/2017 | 506 | $177.41 | $89,769 |
| 2/9/2017 | 1,179 | $177.40 | $209,155 |
| 2/9/2017 | 1,000 | $177.21 | $177,210 |
| 2/9/2017 | 92 | $177.10 | $16,293 |
| 2/9/2017 | 339 | $177.59 | $60,203 |
| 2/9/2017 | 200 | $177.55 | $35,510 |
| 2/9/2017 | 700 | $177.32 | $124,124 |
| 2/9/2017 | 6,300 | $177.61 | $1,118,943 |
| 2/9/2017 | 1,000 | $177.56 | $177,560 |
| 2/9/2017 | 262 | $177.51 | $46,508 |
| 2/9/2017 | 200 | $177.19 | $35,438 |
| 2/9/2017 | 2,001 | $177.42 | $355,017 |
| 2/9/2017 | 604 | $177.44 | $107,174 |
| 2/9/2017 | 100 | $177.25 | $17,725 |
| 2/9/2017 | 100 | $177.65 | $17,765 |
| 2/9/2017 | 675 | $177.60 | $119,880 |

| | | | |
|---|---|---|---|
| 2/9/2017 | 565 | $177.29 | $100,169 |
| 10/27/2017 | 823 | $233.14 | $191,874 |
| 10/27/2017 | 3,500 | $233.13 | $815,955 |
| 10/27/2017 | 1,000 | $233.15 | $233,150 |
| 10/27/2017 | 1,500 | $233.17 | $349,755 |
| 1/31/2018 | 700 | $251.58 | $176,106 |
| 1/31/2018 | 200 | $251.59 | $50,318 |
| 1/31/2018 | 300 | $251.96 | $75,588 |
| 1/31/2018 | 300 | $251.75 | $75,525 |
| 1/31/2018 | 179 | $252.08 | $45,122 |
| 1/31/2018 | 1 | $252.04 | $252.04 |
| 1/31/2018 | 200 | $251.64 | $50,328 |
| 1/31/2018 | 2,110 | $251.77 | $531,235 |
| 1/31/2018 | 1,529 | $251.20 | $385,085 |
| 1/31/2018 | 1,216 | $251.26 | $305,532 |
| 1/31/2018 | 200 | $251.34 | $50,268 |
| 1/31/2018 | 1,730 | $251.71 | $435,358 |
| 1/31/2018 | 3,655 | $251.61 | $919,635 |
| 1/31/2018 | 102 | $252.14 | $25,718 |
| 1/31/2018 | 7 | $252.27 | $1,766 |
| 1/31/2018 | 10 | $252.16 | $2,522 |
| 1/31/2018 | 19 | $251.97 | $4,787 |
| 1/31/2018 | 300 | $252.23 | 75,669 |
| 1/31/2018 | 210 | $251.93 | $52,905 |
| 1/31/2018 | 200 | $251.60 | $50,320 |
| 1/31/2018 | 410 | $252.10 | $103,361 |
| 1/31/2018 | 100 | $251.11 | $25,111 |
| 1/31/2018 | 10 | $252.02 | $2,520 |
| 1/31/2018 | 10 | $251.25 | $2,513 |
| 1/31/2018 | 23,375 | $251.07 | $5,868,761 |
| 1/31/2018 | 285 | $251.50 | $71,678 |
| 1/31/2018 | 298 | $252.21 | $75,159 |
| 1/31/2018 | 6 | $251.08 | $1,506 |
| 1/31/2018 | 2,191 | $251.76 | $551,606 |
| 1/31/2018 | 10 | $251.98 | $2,520 |
| 1/31/2018 | 105 | $251.87 | $26,446 |
| 1/31/2018 | 20 | $252.34 | $5,047 |
| 1/31/2018 | 800 | $251.73 | $201,384 |
| 1/31/2018 | 11 | $252.29 | $2,775 |
| 1/31/2018 | 24 | $252.03 | $6,049 |
| 1/31/2018 | 200 | $251.66 | $50,332 |

| 1/31/2018 | 815 | $251.68 | $205,119 |
|---|---|---|---|
| 1/31/2018 | 210 | $252.13 | $52,947 |
| 1/31/2018 | 217 | $252.01 | $54,686 |
| 1/31/2018 | 200 | $251.79 | $50,358 |
| 1/31/2018 | 1,320 | $251.62 | $332,138 |
| 1/31/2018 | 1,700 | $251.65 | $427,805 |
| 1/31/2018 | 10 | $251.10 | $2,511 |
| 1/31/2018 | 100 | $251.39 | $25,139 |
| 1/31/2018 | 600 | $252.24 | $151,344 |
| 1/31/2018 | 3 | $252.33 | $757 |
| 1/31/2018 | 200 | $252.26 | $50,452 |
| 1/31/2018 | 220 | $252.25 | $55,495 |
| 1/31/2018 | 242 | $251.70 | $60,911 |
| 1/31/2018 | 31 | $252.09 | $7,815 |
| 1/31/2018 | 301 | $251.52 | $75,708 |
| 1/31/2018 | 200 | $251.72 | $50,344 |
| 1/31/2018 | 100 | $251.57 | $25,157 |
| 1/31/2018 | 160 | $251.56 | $40,250 |
| 1/31/2018 | 287 | $252.00 | $72,324 |
| 1/31/2018 | 292 | $251.78 | $73,520 |
| 1/31/2018 | 175 | $251.53 | $44,018 |
| 1/31/2018 | 100 | $251.38 | $25,138 |
| 1/31/2018 | 810 | $252.11 | $204,409 |
| 1/31/2018 | 411 | $251.54 | $103,383 |
| 1/31/2018 | 210 | $251.95 | $52,910 |
| 1/31/2018 | 429 | $252.12 | $108,159 |
| 1/31/2018 | 10 | $252.18 | $2,522 |
| 1/31/2018 | 700 | $251.24 | $175,868 |
| 1/31/2018 | 303 | $251.86 | $76,314 |
| 1/31/2018 | 704 | $251.69 | $177,190 |
| 1/31/2018 | 900 | $251.14 | $226,026 |
| 1/31/2018 | 222 | $252.06 | $55,957 |
| 1/31/2018 | 103 | $251.90 | $25,884 |
| 1/31/2018 | 527 | $251.13 | $132,346 |
| 1/31/2018 | 468 | $251.63 | $117,763 |
| 1/31/2018 | 1 | $251.69 | $252 |
| 1/31/2018 | 3 | $251.83 | $755 |
| 1/31/2018 | 300 | $251.43 | $75,429 |
| 1/31/2018 | 1 | $252.20 | $252 |
| 1/31/2018 | 100 | $251.27 | $25,127 |
| 1/31/2018 | 10 | $251.94 | $2,519 |

| | | | |
|---|---|---|---|
| 1/31/2018 | 201 | $252.17 | $50,686 |
| 1/31/2018 | 110 | $252.19 | $27,741 |
| 1/31/2018 | 11 | $251.90 | $2,771 |
| 1/31/2018 | 100 | $251.55 | $25,155 |
| 1/31/2018 | 2,088 | $251.19 | $524,485 |
| 1/31/2018 | 500 | $251.92 | $125,960 |
| 1/31/2018 | 10 | $252.28 | $2,523 |
| 1/31/2018 | 100 | $251.67 | $25,167 |
| 1/31/2018 | 300 | $251.51 | $75,453 |
| 1/31/2018 | 306 | $251.88 | $77,075 |
| 1/31/2018 | 1,140 | $251.21 | $286,379 |
| 1/30/2019 | 3,419 | $200.01 | $683,834 |
| 1/30/2019 | 9,139 | $200.00 | $1,827,800 |
| 1/30/2019 | 636 | $200.02 | $127,213 |
| 1/30/2019 | 305 | $200.05 | $61,015 |
| 1/31/2019 | 500 | $200.01 | $100,005 |
| 1/31/2019 | 5,988 | $200.03 | $1,197,780 |
| 1/31/2019 | 6,090 | $200.02 | $1,218,122 |
| 1/31/2019 | 712 | $200.05 | $142,436 |
| 3/29/2019 | 250 | $208.69 | $52,173 |
| 3/29/2019 | 111 | $2088.19 | $23,109 |
| 3/29/2019 | 300 | $209.05 | $62,715 |
| 3/29/2019 | 100 | $208.51 | $20,851 |
| 3/29/2019 | 400 | $208.24 | $83,296 |
| 3/29/2019 | 600 | $208.20 | $124,920 |
| 3/29/2019 | 608 | $208.06 | $126,500 |
| 3/29/2019 | 174 | $208.16 | $36,220 |
| 3/29/2019 | 283 | $208.34 | $58,960 |
| 3/29/2019 | 100 | $207.83 | $20,783 |
| 3/29/2019 | 710 | $208.18 | $147,808 |
| 3/29/2019 | 428 | $208.92 | $89,418 |
| 3/29/2019 | 33 | $208.54 | $6,882 |
| 3/29/2019 | 500 | $208.67 | $104,335 |
| 3/29/2019 | 100 | $207.71 | $20,771 |
| 3/29/2019 | 160 | $208.22 | $33,315 |
| 3/29/2019 | 800 | $208.40 | $166,720 |
| 3/29/2019 | 1,200 | $207.29 | $248,748 |
| 3/29/2019 | 400 | $208.63 | $83,452 |
| 3/29/2019 | 644 | $208.38 | $134,197 |
| 3/29/2019 | 400 | $208.45 | $83,380 |
| 3/29/2019 | 172 | $208.91 | $35,933 |

| 3/29/2019 | 187 | $208.08 | $38,911 |
| 3/29/2019 | 88 | $208.02 | $18,306 |
| 3/29/2019 | 200 | $208.09 | $41,618 |
| 3/29/2019 | 200 | $208.66 | $41,732 |
| 3/29/2019 | 200 | $208.33 | $41,666 |
| 3/29/2019 | 250 | $208.81 | $52,203 |
| 3/29/2019 | 43 | $208.57 | $8,969 |
| 3/29/2019 | 384 | $208.82 | $80,187 |
| 3/29/2019 | 400 | $208.23 | $83,292 |
| 3/29/2019 | 100 | $208.00 | $20,800 |
| 3/29/2019 | 90 | $208.72 | $18,785 |
| 3/29/2019 | 167 | $208.53 | $34,835 |
| 3/29/2019 | 300 | $207.72 | $62,316 |
| 3/29/2019 | 110 | $208.73 | $22,960 |
| 3/29/2019 | 200 | $207.73 | $41,546 |
| 3/29/2019 | 100 | $208.70 | $20,870 |
| 3/29/2019 | 526 | $208.13 | $109,476 |
| 3/29/2019 | 600 | $208.32 | $124,992 |
| 3/29/2019 | 200 | $208.47 | $41,694 |
| 3/29/2019 | 50 | $208.83 | $10,442 |
| 3/29/2019 | 500 | $207.35 | $103,675 |
| 3/29/2019 | 300 | $208.49 | $62,547 |
| 3/29/2019 | 100 | $208.25 | $20,825 |
| 3/29/2019 | 79 | $208.62 | $16,481 |
| 3/29/2019 | 278 | $208.58 | $57,985 |
| 3/29/2019 | 310 | $208.28 | $64,567 |
| 3/29/2019 | 1,100 | $208.11 | $228,921 |
| 3/29/2019 | 200 | $208.60 | $341,720 |
| 3/29/2019 | 100 | $208.29 | $20,829 |
| 3/29/2019 | 100 | $208.55 | $20,855 |
| 3/29/2019 | 400 | $208.30 | $83,320 |
| 3/29/2019 | 200 | $208.39 | $41,678 |
| 3/29/2019 | 170 | $208.27 | $35,406 |
| 3/29/2019 | 159 | $208.37 | $33,131 |
| 3/29/2019 | 600 | $207.30 | $124,380 |
| 3/29/2019 | 370 | $209.06 | $77,352 |
| 3/29/2019 | 150 | $208.80 | $31,320 |
| 3/29/2019 | 700 | $207.27 | $145,089 |
| 3/29/2019 | 200 | $208.07 | $41,614 |
| 3/29/2019 | 50 | $208.93 | $10,447 |
| 3/29/2019 | 500 | $208.12 | $104,060 |

| | | | |
|---|---|---|---|
| 3/29/2019 | 150 | $208.89 | $31,334 |
| 3/29/2019 | 900 | $208.05 | $187,245 |
| 3/29/2019 | 100 | $207.70 | $20,770 |
| 3/29/2019 | 28 | $207.37 | $5,806 |
| 3/29/2019 | 29 | $207.45 | $6,016 |
| 3/29/2019 | 620 | $208.15 | $129,053 |
| 3/29/2019 | 200 | $208.36 | $41,672 |
| 3/29/2019 | 420 | $208.21 | $87,448 |
| 3/29/2019 | 188 | $208.86 | $39,266 |
| 3/29/2019 | 300 | $208.14 | $62,442 |
| 3/29/2019 | 800 | $208.17 | $166,536 |
| 3/29/2019 | 100 | $207.89 | $20,789 |
| 3/29/2019 | 12 | $208.03 | $2,496 |
| 3/29/2019 | 300 | $207.82 | $62,346 |
| 3/29/2019 | 400 | $208.31 | $83,324 |
| 3/29/2019 | 100 | $208.68 | $20,868 |
| 3/29/2019 | 517 | $208.35 | $107,717 |
| 3/29/2019 | 100 | $208.79 | $20,879 |
| 3/29/2019 | 100 | $208.76 | $20,875 |
| 3/29/2019 | 50 | $208.71 | $10,436 |
| 3/29/2019 | 300 | $207.32 | $62,196 |
| 3/29/2019 | 241 | $208.46 | $50,239 |
| 3/29/2019 | 100 | $207.69 | $20,769 |
| 3/29/2019 | 200 | $207.77 | $41,554 |
| 3/29/2019 | 100 | $208.43 | $20,843 |
| 3/29/2019 | 100 | $208.01 | $20,801 |
| 3/29/2019 | 900 | $208.10 | $187,290 |
| | **170,777** | | **$36,519,286** |

104.    Defendant Thulin thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Gangestad

105.    Defendant Gangestad is the Company's CFO with a highly sophisticated understanding of the Company's results and their import.

106.   As set forth herein, as early as February 2017, defendant Gangestad possessed material negative information which he knew was being concealed from investors.  Defendant Gangestad consciously acted to exploit his knowledge by selling nearly $3 million of 3M stock to his substantial benefit, as follows:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 2/13/2017 | 2,888 | $181.31 | $523,623 |
| 10/27/2017 | 4,004 | $233.84 | $936,295 |
| 2/1/2018 | 1,681 | $249.76 | $419,847 |
| 2/7/2019 | 2,800 | $201.43 | $565,004 |
| 2/7/2019 | 1,181 | $201.15 | $237,558 |
| 2/7/2019 | 298 | $201.20 | $59,958 |
| 2/7/2019 | 100 | $201.45 | $20,145 |
| 2/7/2019 | 202 | $201.17 | $40,636 |
| 2/7/2019 | 100 | $201.47 | $20,147 |
| | **13,254** | | **$2,822,213** |

107.   Defendant Gangestad thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

Roman

108.   Defendant Roman is the Company's CEO with a highly sophisticated understanding of the Company's results and their import.

109.   As set forth herein, defendant Roman possessed material negative information which he knew was being concealed from investors.  Defendant Roman consciously acted to exploit his knowledge by selling over $1 million of 3M stock to his substantial benefit, as follows:

| Date | Shares | Price | Proceeds |
|------|--------|-------|----------|
| 2/2/2018 | 200 | $246.62 | $49,324 |

| 2/2/2018 | 100 | $246.69 | $24,669 |
| 2/2/2018 | 100 | $246.61 | $24,661 |
| 2/2/2018 | 2,946 | $246.66 | $726,660 |
| 2/2/2018 | 300 | $246.63 | $73,989 |
| 2/2/2018 | 100 | $246.59 | $24,659 |
| 2/2/2018 | 100 | $246.64 | $24,664 |
| 2/2/2018 | 300 | $246.65 | $73,995 |
| | **4,146** | | **$1,022,621** |

110.   Defendant Roman thus used his fiduciary position to enrich himself and failed to discharge his duties by causing the Company to candidly reveal the truth of its business condition.

## VI.   DAMAGES TO THE COMPANY

111.   As a direct and proximate result of the Individual Defendants' conduct, 3M has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a)   Legal fees incurred in connection with the PFAS-related environmental litigation;

b)   Any funds, including penalties, paid to settle the PFAS-related environmental litigation; and

c)   Costs incurred from compensation and benefits paid to the defendants who have breached their duties to 3M.

112.   In addition, 3M's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business. The credibility and motives of management are now in serious doubt.

113.    The actions complained of herein have irreparably damaged 3M's corporate image and goodwill.  For at least the foreseeable future, 3M will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that 3M's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

114.    Plaintiff brings this action derivatively in the right and for the benefit of 3M to redress injuries suffered, and to be suffered, by 3M as a direct result of breaches of fiduciary duty by the Individual Defendants, insider trading, and contribution for violations of Section 10(b) of the Exchange Act.  3M is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

115.    Plaintiff will adequately and fairly represent the interests of 3M in enforcing and prosecuting its rights.

116.    Plaintiff has continuously been a shareholder of 3M at times relevant to the wrongdoing complained of and is a current 3M shareholder.

117.    When this action was filed, 3M's Board of Directors consisted of defendants Roman, Brown, Dillon, Eskew, Henkel, Hood, Kent, Moyo, Page, and Woertz and non-party Craig. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

A.   **Demand is Excused Because There is Reason to Doubt a Majority of the Board Acted in Good Faith**

1.   **3M's Internal Studies Showed the Toxic Effect of PFAS**

118.   According to the internal documents produced in connection with the Minnesota A.G. Litigation, since the 1970s, the Company conducted internal studies showing that PFAS posed a serious risk to public health.

119.   Specifically, the Company knew that PFAS was toxic to the environment and difficult to remove.  For example, a 1960 internal memo described the Company's understanding that PFAS from chemical wastes dumped into landfills could reach groundwater and would "eventually reach the water table and pollute domestic wells."  And in a technical report from 1979, 3M scientists concluded that PFAS had the "potential for widespread distribution in the environment," were "completely resistant to biodegradation" and "would be expected to persist in the environment for extended periods of time." Therefore, PFAS could "impact . . . human food source[s] by significantly reducing the survival rates" of aquatic life exposed to PFAS.

120.   Moreover, the Company knew that PFAS remained in the circulatory system and was toxic to humans.  Beginning in 1976, 3M investigated its employees' exposure to fluorochemicals and found that employees' blood showed PFOA levels between 50 and 1,000 normal levels.  Subsequent animal and human studies showed that PFAS had harmful effects, including causing birth defects and cancer.

### 2. The Individual Defendants Knew or Should Have Known that 3M Faced Significant Liability

121. Due to the Company's own data showing that PFAS could easily contaminate water sources, was difficult to remove, and was toxic to humans, the Individual Defendants knew or should have known that the Company faced significant exposure for environmental liabilities through lawsuits and regulatory actions.

122. Indeed, as early as February 2017 (if not earlier), defendants Brown, Dillon, Eskew, Henkel, Kent, Page, and Woertz knew that 3M faced significant environmental liabilities and should have caused the Company to conduct an assessment related to its historical PFAS manufacturing operations to record an appropriate reserve for the potential exposure based on, among other things, the $671 million settlement between the Company's customer, DuPont, and related companies as to thousands of personal injury lawsuits for PFOA health impacts.

123. Moreover, defendants Brown, Dillon, Eskew, Henkel, Hood, Kent, Page, and Woertz knew as of February 2018 (if not earlier) that 3M faced significant environmental liabilities because the Company had settled the Minnesota A.G. Litigation for $850 million, the third largest settlement for a claim for damage to natural resources, and 3M still faced several pending lawsuits alleging similar claims. Indeed, analysts estimated that the Company's PFAS-related liability totaled more than $5 billion, yet defendants Brown, Dillon, Eskew, Henkel, Hood, Kent, Page, and Woertz did not increase the Company's reserve for environmental liabilities until more than a year after the settlement of the Minnesota A.G. Litigation and even then, it was only increased by a paltry $235 million.

### B.    Additional Reasons Demand is Excused

#### 1.    Roman is Not Disinterested

124.    Roman serves as 3M's CEO, and therefore is not independent under NASDAQ listing rules.  As an employee, Roman derives substantially all of his income from his employment with 3M, thus could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.  Moreover, as CEO and as alleged herein, Roman personally issued the misleading statements alleged herein. As a result, Roman would be interested in a demand regarding his own wrongdoing and demand is futile as to him.

#### 2.    Reason Exists to Doubt the Audit Committee Acted in Good Faith

125.    Brown, Dillon, Moyo, and Page served as the members of the Audit Committee at relevant times.  As such, they are responsible for the effectiveness of the Company's internal controls, the integrity of its financial statements, and its compliance with laws and regulations.  In their capacities as Audit Committee members, Brown, Dillon, Moyo, and Page reviewed and approved the disclosures regarding the Company's environmental liabilities with respect to PFAS.  As alleged herein, Brown, Dillon, Moyo, and Page failed to ensure the integrity of the Company's internal controls, allowing the materially misleading statements to be disseminated in 3M's SEC filings and other disclosures.  Thus, Brown, Dillon, Moyo, and Page breached their fiduciary duties and are not disinterested, and demand is excused as to them.

## COUNT I
### Against Defendants Thulin, Gangestad, and Roman for Breach of Fiduciary Duty

126.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

127.   Defendants Thulin, Gangestad, and Roman each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of 3M's business and affairs, particularly with respect to issues as fundamental as public disclosures.

128.   The conduct by defendants Thulin, Gangestad, and Roman set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants Thulin, Gangestad, and Roman intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of 3M.

129.   In breach of their fiduciary duties owed to 3M, defendants Thulin, Gangestad, and Roman willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

130.   In particular, defendants Thulin, Gangestad, and Roman knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

131.   As a direct and proximate result of the breaches of their fiduciary obligations by defendants Thulin, Gangestad, and Roman, 3M has sustained and continues to sustain

significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

<u>**COUNT II**</u>
**(Against Defendants Thulin, Gangestad, and Roman for Contribution
For Violations of Sections 10(b) and 21D of the Exchange Act)**

132.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

133.   The conduct of Defendants Thulin, Gangestad, and Roman, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

134.   3M is named as a defendant in related securities fraud lawsuit that allege and assert claims arising under § 10(b) of the Exchange Act. The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein. If 3M is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts. The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

135.   As officers, directors and otherwise, Defendants Thulin, Gangestad, and Roman had the power or ability to, and did, control or influence, either directly or indirectly, 3M's general affairs, including the content of its public statements, and had the

power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

136.   Defendants Thulin, Gangestad, and Roman are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

137.   Defendants Thulin, Gangestad, and Roman have damaged the Company and are liable to the Company for contribution.

138.   No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

## COUNT III

### Against Thulin, Gangestad, and Roman – Brophy Claim

139.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

140.   As alleged above, Thulin, Gangestad, and Roman are fiduciaries of 3M, possessed material, non-public information of 3M, and used that information improperly to profit from sales of 3M stock. When Thulin, Gangestad, and Roman directed the stock sales set forth above, they were motivated to do so, in whole or in part, by the substance of the material, non-public information they possessed, and they acted with scienter.

141.   When Thulin, Gangestad, and Roman sold their 3M stock, they knew that the investing public was unaware of the negative material information that they possessed. They also knew that if the information were disclosed, the market price of 3M stock would be significantly lower. Thulin, Gangestad, and Roman timed their stock sales to take

advantage of the investing public's ignorance of the concealed material facts and obtain a higher price for the stock they sold. They thereby benefitted by misappropriating 3M's non-public information.

142.   Plaintiff has no adequate remedy at law.

**<u>COUNT IV</u>**
**Against the Defendants Brown, Dillon, Eskew, Henkel, Hood, Kent, Moyo, Page, Woertz, Liddy, Barbour, Coffman, and Ulrich for Breach of Fiduciary Duty**

143.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.   These Defendants each owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of 3M's business and affairs, particularly with respect to issues as fundamental as public disclosures.

145.   These Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.   These Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of 3M.

146.   In breach of their fiduciary duties owed to 3M, these Defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

147.   In particular, these Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report revenue and the Company's overall prospects.

148.   As a direct and proximate result of these Defendants' breaches of their fiduciary obligations, 3M has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of 3M, demands judgment as follows:

A.   Declaring that plaintiff may maintain this action on behalf of 3M and that plaintiff is an adequate representative of the Company;

B.   Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

C.   Declaring that Defendants have breached and/or aided and abetted the breach of their fiduciary duties to 3M;

D.   Directing 3M to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect 3M and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

       1.     a proposal to strengthen the Company's controls over financial reporting;

       2.     a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

       3.     a proposal to strengthen 3M's oversight of its disclosure procedures;

       4.     a provision to control insider transactions; and

       5.     a provision to permit the stockholders of 3M to nominate at least three candidates for election to the Board;

E.     Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of 3M has an effective remedy;

F.     Awarding to 3M restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

G.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), plaintiff demands a trial by jury.


Dated: February 8, 2021                    Respectfully submitted,

                                           By: /s/ Daniel C. Hedlund
                                           **GUSTAFSON GLUEK PLLC**
                                           Daniel E. Gustafson (#202241)
                                           Daniel C. Hedlund (#258337)
                                           David A. Goodwin (#0386715)
                                           Mary M. Nikolai (#0400354)
                                           Canadian Pacific Plaza
                                           120 South Sixth Street, Suite 2600
                                           Minneapolis, MN 55402
                                           Telephone: (612) 333-8844
                                           E-mail: dgustafson@gustafsongluek.com
                                           E-mail: dhedlund@gustafsongluek.com
                                           E-mail: dgoodwin@gustafsongluek.com
                                           E-mail: mnikolai@gustafsongluek.com

                                           **GLANCY PRONGAY & MURRAY LLP**
                                           Benjamin I. Sachs-Michaels
                                           712 Fifth Avenue
                                           New York, New York 10019
                                           Telephone: (212) 935-7400
                                           E-mail: bsachsmichaels@glancylaw.com

                                                          -and-

                                           Robert V. Prongay
                                           Pavithra Rajesh
                                           1925 Century Park East, Suite 2100
                                           Los Angeles, California 90067
                                           Telephone: (310) 201-9150
                                           E-mail: rprongay@glancylaw.com

**LAW OFFICE OF ALFRED G. YATES, JR.**
Alfred G. Yates, Jr.
1575 McFarland Road, Suite 305
Pittsburgh, Pennsylvania 15216
Telephone: (412) 391-5164

*Counsel for Plaintiff Charles R. Blackburn*